**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

JAKE FINLEY,

          Plaintiff,

v.                                                                    Case No. 20-11739

MANUEL MORA, *et al*.,

          Defendants.

_____/

**OPINION AND ORDER GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      This negligence action arises from a collision between Plaintiff Jake Finley's

tractor-trailer and Defendant Nina Transport, Inc.'s tractor-trailer, as driven by

Defendant Manuel Mora.  Before the court is Defendants' Motion for Summary

Judgment, which is fully briefed.  (ECF Nos. 19, 20, 21.)  A hearing on the motion was

held, and the matter is now ready for determination.  For the following reasons, the

court grants Defendants' motion for summary judgment.

### I.  BACKGROUND[1]

### A.  The Accident

      On January 7, 2020, Defendant Mora, working for Defendant Nina Transport,

Inc., drove a tractor-trailer to a gas station and pulled into the area designated as a

truck rest stop. (ECF No 1, PageID.21; ECF 19-2, PageID.156-7.) The right front of

Defendant Mora's vehicle collided with the left rear of Plaintiff's parked tractor-trailer, in

which Plaintiff was seated in the driver's seat. (*Id*.). As noted by the police dispatched to

---

[1]     The facts are stated in the light most favorable to Plaintiff.

the scene, the parties' vehicles suffered minor to no damages. (ECF No. 19-2, PageID.156-57.) However, according to Plaintiff, the crash was "hard," causing him to "fl[y] in[to] the steering wheel [and] the dashboard and [he] was bounced around the cab." (ECF No. 20-9, PageID.365.)[2]

## B. Post-Accident Medical History

Plaintiff could not recall getting any bruising on his body as a result of the accident (ECF No. 19-3, PageID.174.) He also did not have any cuts and did not lose consciousness. (*Id.*) He did notice pain to his neck and back, but he did not report any injuries to the responding police officers or show visible signs of distress as he walked and moved around. (ECF No. 19-3, PageID.176-77; ECF No. 19-5.)

After the accident, Plaintiff got back into his vehicle and continued working. (ECF No. 19-5; ECF 19-3, PageID.177.)  At the next load site, which was three or four miles away, Plaintiff started feeling pain in both arms when he tried to open the trailer doors. (ECF No. 19-3, PageID.177-78.) He informed his employer that he needed to go the doctor, returned the tractor-trailer to the yard, and drove his personal vehicle to Concentra Clinic in Southfield. (ECF No. 19-3, PageID.178-79; ECF No. 19-6.) At Concentra, he complained of neck, shoulder, and back pain. (ECF No. 19-6.) Dr. Jacqueline Friedman diagnosed Plaintiff with strains of his lumbar region, neck muscle, bilateral shoulders and thoracic spine (*Id.*, PageID.202). Plaintiff was prescribed Ibuprofen and two weeks of physical therapy. (ECF No. 19-6, PageID.202-03.)

---

[2]     Plaintiff stated during his deposition that he does not recall which part of his body hit the interior of his vehicle (ECF No. 19-3, PageID.174.)

On January 9, 2020, Plaintiff saw Dr. Prizzy Job of Henry Ford Internal Medicine, presenting with complaints of high blood pressure as well as pains in neck, back, and shoulder. (ECF No.19-7, PageID.208.) Plaintiff told the doctor about the accident and that he "felt entire body shakiness" from the collision (*Id.*) He "denie[d] any wound or bruises [or] hitting of his head." (*Id.*)

On January 17, Plaintiff underwent x-rays of his shoulders and spine. (ECF No. 19-8.) The x-ray for Plaintiff's thoracic spine showed no acute facture or dislocation, no lytic[3] or blastic[4] lesions, and no soft tissue swelling, but there were degenerative changes with hypertrophic spur formation[5] (*Id.*, PageID.214.) The x-rays for his shoulders indicated no evidence of acute fracture, dislocation, or osseous[6] lesion. (*Id.*, PageID.212, 216.)

On January 29, Plaintiff had a follow-up visit at Concentra. (ECF No.19-9.) Dr. Elizabeth Hall took Plaintiff's history and noted that he had an injury to his neck and back about two and a half years ago, which had caused him to miss work for a short period of time. (*Id.*, PageID.210). Finding Plaintiff in neck, shoulder, hip and thoracic back pain, Dr. Hall ordered magnetic resonance imaging (MRIs) of Plaintiff's cervical

---

[3]     "Lytic" is used colloquially for osteolytic, which refers to an area of damaged bone. *See Lytic,* Stedman's Medical Dictionary (28th ed.); *Osteolytic,* Stedman's Medical Dictionary (28th ed.).

[4]     "Blastic is a colloquial term for "oseoblastic," which refers to an area of increased bone density. *Blastic,* Stedman's Medical Dictionary (28th ed.). *Osteoblastic*, Stedman's Medical Dictionary (28th ed.).

[5]     "Hypertrophic spur formation" refers to the forming of growing bony projections. *See Hypertrophy*, Stedman's Medical Dictionary (28th ed.); *Spur*, Oxford Concise Medical Dictionary (10th ed. 2020).

[6]     "Osseous" means "[b]ony, of bonelike consistency or structure." *Osseous*, Stedman's Medical Dictionary (28th ed.).

spine, lumbar spine, and right shoulder, and prescribed him with anti-inflammatory medications. (ECF No. 20-4, PageID.339.)

On February 7, Plaintiff underwent nerve conduction velocity (NCV)[7] and electromyography (EMG)[8] tests. (ECF No. 19-10). They showed no electrodiagnostic evidence of a right cervical radiculopathy.[9] (*Id.*, PageID.223.)

On February 12, MRIs were taken for Plaintiff cervical spine, lumbar spine, and right shoulder. (ECF Nos. 20-5, 20-6, 20-7.) The right shoulder MRI revealed "13x5 mm high grade partial tears of the anterior fibers of supraspinatus tendon foot plate [sic.][10] on the humeral tuberosity[11]." (ECF No. 20-5, PageID.341.) Several herniated and bulging discs appeared on the cervical and lumbar spines MRIs. (ECF No. 20-6, PageID.345; ECF No. 20-77, PageID.348.)

On March 10, Dr. Timothy Doig, a board-certified orthopedic surgeon, diagnosed Plaintiff with right shoulder rotator cuff tear, right shoulder biceps tendon tear and

---

[7]    "Nerve conduction velocity (NCV)" is "the rate of impulse conduction in a peripheral nerve or its various component fibers, generally expressed in meters per second." *Nerve conduction velocity (NCV)*, Stedman's Medical Dictionary (28th ed.).

[8]    "Electromyography" is "[t]he recording of electrical activity generated in muscle for diagnostic purposes." *Electromyography*, Stedman's Medical Dictionary (28th ed.).

[9]    "Radiculopathy" means "[d]isorder of the spinal nerve roots." *Radiculopathy*, Stedman's Medical Dictionary (28th ed.). This is commonly known as a pinched nerve. *See Radiculopathy,* John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Aug. 11, 2022).

[10]    "Supraspinatus tendon" refers to the tendon of the shoulder joint muscle that contributes to the rotator cuff. *See Supraspinatus (muscle),* Stedman's Medical Dictionary (28th ed.).

[11]    "Humeral tuberosity" refers to the rounded elevation of bone at the top of the humerus. *See Humeral,* Stedman's Medical Dictionary (28th ed.); *Tuberosity,* Stedman's Medical Dictionary (28th ed.).

subacromial bursitis[12] with acromial spur. (ECF No. 20-2, PageID.326-27; ECF No. 20-8, PageID.350.) Plaintiff was prescribed steroid injection, anti-inflammation medication, and activity modification, and was limited to strict home exercise program. (ECF No. 20-2, PageID.326; ECF No.20-8, PageID.350.) Then, on May 26, Dr. Doig performed a surgery on Plaintiff with the following procedures: "right shoulder diagnostic and operative arthroscopy[13] with rotator cuff repair," "biceps tenotomy,[14]" "subacromial decompression with acromioplasty,[15]" and "PRP [(platelet-rich plasma)] injection." (ECF No. 20-2, PageID.327; ECF No. 20-10, PageID.402-3.) According to Dr. Doig, the diagnostic arthroscopy identified torn bicep tendon and a partial thickness rotator cuff tear. (ECF No. 20-10, PageID.402; ECF No. 20-8, PageID.350.)

On June 17, Plaintiff saw Dr. Hall at Concentra for a reevaluation. (ECF No. 19-13.) Plaintiff complained about having spinal pain in the neck and back, which occasionally radiated down to his legs and knees. (*Id.*, PageID.237.) Dr. Hall noted that Plaintiff was "a very poor historian" and "[could not] really describe what ma[de] the pain worse and what ma[de] it better." (*Id.*). Dr. Hall expressed concerns with how Plaintiff "ha[d] so many pain behaviors and [was] ambulating with the straight cane" despite "no

---

[12]    "Subacromial bursitis" is the inflammation of the bursa, a sac of tissue under the acromion and the rotator cuff. *Subacromial bursitis,* Stedman's Medical Dictionary (28th ed.). "Acromion" is known as the point of the shoulder. *See Acromion*, Stedman's Medical Dictionary (28th ed.).
[13]    "Arthroscopy" is the examination of the interior of a joint. *See Anthroscopy*, Stedman's Medical Dictionary (28th ed.).
[14]    "Tenotomy" is the surgical division of the tendon to correct a joint deformity. *See Tenotomy,* Stedman's Medical Dictionary (28th ed.).
[15]    This refers to the process of reshape the bone spur on the acromion to relief pressure on the area beneath (subacromial area). *See Acromioplasty,* Stedman's Medical Dictionary (28th ed.); *Subacromial,* Stedman's Medical Dictionary (28th ed.).

evidence to suggest a cervical myelopathy,[16] and his thoracic and lumber pain [being] myofascial[17] in nature." (ECF No. 19-13, PageID.238.) While recommending orthopedic spinal surgery evaluation, Dr. Hall advised Plaintiff that surgery on his cervical spine "will not help the myofascial pain in the thoracis or lumbar spine" and instead Plaintiff would be "most benefitted with exercise and movement." (*Id.*)

On June 30, Plaintiff visited Dr. Nilesh M. Patel, M.D. with complaints of cervical and lumbar pain. (ECF No.20-11, PageID.407-10.). Dr. Patel examined Plaintiff, reviewed the x-rays and MRIs that had been taken, including an additional MRI of Plaintiff's hip which show "right iliopsoas bursitis[18] or tiny ganglion cyst[19] formation." (*Id.*) Dr. Patel diagnosed Plaintiff with radiculopathy in the cervical region, radiculopathy in the lumbosacral region[20], and pain in the right hip. (ECF No. 20-11, PageID.409-10.)

On July 17, Plaintiff saw Dr. Ayman Tarabishy. (ECF No. 19-14.) There, Plaintiff complained of neck, back, and hip pain. (*Id.*, PageID.240.) Dr. Tarabishy did a physical examination of Plaintiff and found reduced range of motion, decreased sensation, and

---

[16]     "Myelopathy" refers to a disorder of the spinal cord. *Myelopathy,* Stedman's Medical Dictionary (28th ed.).

[17]     "Myofascial" means "[o]f or relating to the fascia [(connecting tissues)] surrounding and separating muscle tissue." *Myofascial,* Stedman's Medical Dictionary (28th ed.); *see Fascia,* Stedman's Medical Dictionary (28th ed.).

[18]     "Iliopsoas bursitis" refers to the inflammation of the bursa which lies between the front of the hip joint and the iliopsoas muscle (a group of muscles situated in the groin area). *See Iliopsoas (muscle),* Stedman's Medical Dictionary (28th ed.); *Bursitis,* Stedman's Medical Dictionary (28th ed.).

[19]     "Ganglion" means the aggregation of nerve cell bodies located in the peripheral nervous system or a cyst containing fluid usually attached to a tendon sheath in the hand, wrist, or foot, or connected with the underlying joint. *Ganglion,* Stedman's Medical Dictionary (28th ed.). In this situation, the latter definition is more likely applicable.

[20]     "Lumbosacral region" refers to the area surrounding the spine composed of the lumbar vertebrae and the sacrum. *Lumbosacral*, Stedman's Medical Dictionary (28th ed.).

weaknesses in his arms (*Id.*, PageID.240.) Dr. Tarabishy diagnosed Plaintiff with cervical and lumbar radiculopathy and prescribed him with injections and pain medications. (*Id.*, PageID.242.)

On September 30, Dr. Doig ordered an additional MRI of Plaintiff's left shoulder. (ECF No. 20-2.) The imaging revealed "degenerative change of the AC [(acromioclavicular)] joint,[21]" "tendinopathy[22] in the supraspinatus, infraspinatus, biceps tendon and subscapularis,[23]" as well as "evidence of bursitis.[24]" (ECF No. 20-2, PageID.327.)

On October 12, Plaintiff underwent an independent medical examination with Dr. Jerry Matlen, M.D., a board-certified orthopedic surgeon. (ECF No. 19-21.). Dr. Malten found that Plaintiff's "ongoing symptoms are most consistent with degenerative cuff arthropathy[25] bilaterally." (*Id.*, PageID.282.) Specifically, Dr. Malten opined that the spur and tears in Plaintiff's right shoulder" was "most consistent with a degenerative condition." (*Id.*) Regarding Plaintiff's left shoulder, Dr. Malten indicated that it "may have involved a strain but the underlying imaging studies and exams that have followed are most consistent with a degenerative cuff arthropathy." (*Id.*) Evaluating Plaintiff's cervical

---

[21]     The "acromioclavicular joint" is the joint in the shoulder where the clavicle (or collarbone) meets the shoulder blade. *See Articular disc or acromioclavicular joint*, Stedman's Medical Dictionary (28th ed.).
[22]     "Tendinopathy," otherwise known as tendinitis, is the inflammation of a tendon. *See Tendinitis,* Stedman's Medical Dictionary (28th ed.).
[23]     "Supraspinatus," "infraspinatus," and "subscapularis" are "intrinsic … muscle[s] of shoulder joint, the tendon of which contributes to the rotator cuff." *See Supraspinatus,* Stedman's Medical Dictionary (28th ed.); *Infraspinatus,* Stedman's Medical Dictionary (28th ed.); *Subscapularis*, Stedman's Medical Dictionary (28th ed.).
[24]     "Bursitis" is the "[i]nflammation of a bursa." *Bursitis*, Stedman's Medical Dictionary (28th ed.).
[25]     "Arthropathy" is "[a]ny disease affecting a joint." *Arthropathy*, Stedman's Medical Dictionary (28th ed.).

spine, lumbar spine, and hips, Dr. Malten identified "no obvious objective findings" and concluded that "[t]he mainstay of [Plaintiff's] clinical evaluation regarding his cervical spine, lumbar spine, and hips would be that of strains" and no orthopedic treatment was needed beyond four to six weeks of therapy and medication. (*Id.*, PageID.283.)

On November 9, Plaintiff went through another independent medical examination; this time, it was with Dr. Robert Kohen, also a board-certified orthopedic surgeon (ECF No. 19-22.). Dr. Kohen opined that it is possible, though unlikely, that the January 7 collision played a role in the development of Plaintiff's shoulder and hip issues (*Id.* PageID.291.) Dr. Kohen emphasized Plaintiff's ability to use his arms freely with no sign of issues immediately after the incident. (*Id.*) Dr. Kohen also concluded that Plaintiff no longer had any shoulder and hip issues related to the January 7 collision requiring restrictions and deferred any questions related to back and spine to a different specialist. (*Id.*, PageID.292).

On March 16, 2021, Dr. Doig performed a surgical procedure in Plaintiff's left shoulder in the form of "diagnostic and operative arthroscopy with subacromial decompression and acromioplasty as well as biceps tenotomy." (ECF No. 20-2, PageID.327). Dr. Doig said Plaintiff "did not have a full-thickness rotator cuff tear that needed to be repaired at that time, but he did have spurring of the AC joint and bicipital tendinitis." (*Id.*)

Since the accident, Plaintiff has been on leave from work.[26] Plaintiff claims constant pain in his back, neck, shoulders, and hips. (ECF No. 20-9, PageID.380).  He

---

[26]     Plaintiff's workers compensation carrier has voluntarily paid all his workers compensation benefits. (ECF No. 20-9, PageID.357.)

needs a cane to walk. (*Id.*) He has no strength in his right hand. (*Id.*, PageID.382.) And he cannot drive for longer than 15-20 minutes at a time. (*Id.*)

### C. Pre-Accident Medical History

On November 1, 2016, Plaintiff was involved in an automobile accident. (ECF No. 19-16.) The next day, he reported to Concentra clinic with complaints of neck, back, knee, and foot/toe pain (ECF No. 19-17, PageID.257.) The doctor assessed him with lumbar sprain and strains of neck, knee, and foot (*Id.*, PageID.256). On November 15, Plaintiff revisited Concentra for a follow-up (ECF No. 19-18.) Then, he still complained of pain in neck and back (*Id.*, PageID.164). He was diagnosed with strains thereof. (*Id.*)

On July 28, 2018, Plaintiff got into another automobile accident. (ECF No. 19-19). There was no evidence of any injuries suffered by Plaintiff therefrom.

### D. Experts' Opinions Regarding Causation

Both parties offer expert opinions regarding what caused Plaintiff's injuries. Plaintiff presents an affidavit from Dr. Doig, who stated that "it is [his] opinion within a reasonable degree of medical certainty that the **automobile accident of January 7, 2020, causes the medical conditions** documented in [his] operative report and the resultant pain that [Plaintiff] experienced in his right shoulder." (ECF No. 20-8, PageID.351) (emphasis in original). [27] Dr. Doig came up with this opinion through his

---

[27]    The parties' summary judgment briefings do not fully flesh out the admissibility issue of Dr. Doig's causation opinion. However, Defendants have made a separate motion to exclude the opinion testimony of Plaintiff's treating physicians about the proximate cause of Plaintiff's injuries (ECF No. 26.) This motion is fully briefed with Plaintiff's response in opposition, arguing that Dr. Doig should be allowed to testify that Plaintiff's shoulder injuries were caused by the accident. (ECF No. 27.) In deciding Defendants' motion for summary judgment, the court avails itself of the arguments and evidence presented in these filings (ECF Nos. 26, 27, 28), as the resolution of this motion clarifies Defendants' summary judgment motion.

treatment of Plaintiff, during which he took Plaintiff's medical history, conducted physical exams, reviewed imaging and performed surgery on Plaintiff's shoulders. (ECF No. 27-7, PageID.515.).

On the other side, Defendants offer the testimony of their expert, Deborah R. Marth, a Ph.D. in biomedical engineering, who opined that "[t]he forces of [the] impact [on January 7, 2020] was so low, that there was no potential for [Plaintiff's] body to move and contact any portion of the cab interior, other than the seat he was sitting on." (ECF No. 19-1, PageID.149.) Dr. Marth further stated that "[Plaintiff's] medical and radiological findings reveal degenerative conditions which are a product of aging and wear and tear," and that the accident did not cause Plaintiff "any traumatic injuries of any type or severity" or "exacerbate any of [Plaintiff's] pre-existing degenerative conditions." (*Id*.).

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presenting evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Not all factual disputes are material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013). There is no requirement that the moving party "support its motion with [evidence] negating the

opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

The court will deny summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "The essential question is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (internal quotations omitted). All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### III. DISCUSSION

The parties dispute over (1) the existence of a "serious impairment of body function" and (2) the causal connection between Plaintiff's injuries and the accident. The court addresses these issues in turn.

### 1.  Serious Impairment Of Body Function

Under the Michigan No Fault Insurance Act (Mich. Comp. Laws § 500.3101 *et seq.*) ("the Act"), a plaintiff can only bring claims for noneconomic tort liability where he establishes that he "suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws § 500.3135(1). A plaintiff must prove three factors to establish a "serious impairment of body function": (1) an objectively manifested impairment, (2) of an important body function that, (3) affects the person's general ability to lead his or her normal life. Mich. Comp. Laws § 500.3135(5); *see McCormick v. Carrier,* 487 Mich. 180, 215 (2010). "The serious impairment analysis is inherently fact- and circumstance-specific and must be conducted on a case-by-case basis." *McCormick,* 487 Mich.at 215.

### a.  Objectively Manifested Impairment

An impairment is "objectively manifested" when it is "evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *Id.* at 196. Meaning, it must be "observable or perceivable from actual symptoms or conditions." *Id.* The "aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v. Blankenship*, 286 Mich. App. 54, 63 (2009). "[P]ain and suffering alone" is insufficient to show a serious impairment of body function, and therefore a plaintiff must "introduce evidence establishing that there is a physical basis for their subjective complaints of pain and suffering[.]" *McCormick*, 487 Mich. at 197-198.

Here, contrary to Defendants' assertions, Plaintiff offers evidence of objective and observable symptoms in the form of MRIs (lumbar, cervical, and shoulders),

medical testimony about his surgery, and other diagnoses from medical experts. Specifically, Plaintiff's February 12 right shoulder MRI showed numerous tears and subacromial bursitis with acromial spur. (ECF No. 20-5, PageID.341.) The cervical and lumbar spines MRIs taken on the same day revealed several herniated and bulging discs. (ECF No. 20-6, PageID.345; ECF No. 20-7, PageID.348.) The September 30 MRI of Plaintiff's left shoulder revealed tendinopathy in shoulder muscles and bursitis. (ECF No. 20-2, PageID.327.) Testimony from Dr. Doig and medical report indicating that May 26 surgical procedure revealed objective manifestations of medically identifiable injuries. (ECF No. 20-10, PageID.402; ECF No. 20-8, PageID.350.) On June 30, Dr. Patel reviewed the imaginings that had been taken of Plaintiff in coming up with the diagnosis of radiculopathy in the cervical and lumbosacral regions and pain in the right hip. (ECF No. 20-11, PageID.407-10.). This evidence is not merely acknowledgment of any subjective pain, but objective in nature.

The cases relied on by Defendants are inapplicable and distinguishable from the present case with regard to the objective manifestation issue. First, Defendants cite *Lopez-Garcia v. United States*, which focused more on the causation of the alleged impairment (an issue the court will address later), rather than its objective manifestation. 207 F. Supp. 3d 753, 758 (E.D. Mich. 2016). The facts in that case were also different. There, Plaintiff's "x-rays came back normal" and a CT scan and MRI were deemed "normal" and showed no signs of an acute fracture. 207 F. Supp. 3d at 755, 759. Here, although the initial x-rays may have come back without convincing evidence of any impairments, their existence was demonstrated by follow-up MRIs.

Similarly, in *Mehdi v. Gardner*, the Michigan appellate court held that plaintiff failed to establish this factor where the "only documented manifestations of [his] injuries were "subjective symptoms" of neck and back pain. No. 319630, 2015 WL 1227710, *2 (Mich. Ct. App. Mar. 17, 2015).[28] In this case, Plaintiff does not rely merely on documentations of subjective symptoms, but rather proffers evidence from MRIs and surgical notes of observable impairments.

Defendants further cite *Bayley v. United States* for the proposition that a medical provider's note acknowledging a patient's subjective pain does establish this factor. No. 17-11942, 2018 WL 4901153, at *5 (E.D. Mich. Oct. 9, 2018). But here, although Plaintiff offers medical provider's notes, they include more than mere acknowledgements of Plaintiff's subjective pain; they also describe objective and observable symptoms from MRIs and from surgery.

Accordingly, Plaintiff provides sufficient evidence to support the conclusion that his impairment is objectively manifested, creating a genuine issue of material fact.

### b. Important Body Function

The Act provides that the impairment must be "of an important body function, which is a body function of great value, significance, or consequence to the injured person." Mich. Comp. Laws § 500.3135(5)(b). According to the Michigan Supreme Court, whether a body function has "great value," "significance," or "consequence" varies "depending on the person" and is thus an inherently subjective inquiry that must

---

[28] The *Mehdi* court also said that "[a]lthough objective tests later revealed nerve abnormalities, and a bulging spinal disc, plaintiff presented no evidence that the accident caused these conditions." 2015 WL 1227710, at *2.

be decided on a case-by-case basis. *McCormick*, 487 Mich. at 199 (internal citations omitted). The parties do not dispute this prong.

### c. Effects on Plaintiff's General Ability to Lead His Normal Life

Under the Act, the impairment must "affect[] the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living . . . [which] requires comparison of the injured person's life before and after the incident." Mich. Comp. Laws § 500.3135(5)(c). According to the Michigan Supreme Court, "the plain text of the statute and the[] definitions demonstrate that the common understanding of of to 'affect the person's ability to lead his or her normal life' is to have an influence on some of the person's capacity to live in his or her normal manner of living… [,which] necessarily requires a comparison of the plaintiff's life before and after the incident." *McCormick*, 487 Mich. at 202.

Defendants argue that Plaintiff's lifestyle was not materially altered by the accident at issue. Defendants rely on Plaintiff's pre-existing degenerative conditions and unchanged lack of social activities and hobbies. (ECF No. 19, PageID.127.) However, Plaintiff offers evidence to show that his normal manner of living has changed: he must walk with the assistance of a cane; he cannot open a jar because he has no strength in his right hand; he cannot clean his house; he cannot drive for longer than 20 minutes; and he does not work but instead spending his days going to the doctors' appointments or sleeping. (ECF No. 20-9, PageID.382.)

The present situation is distinguishable from the cases cited by Defendants where plaintiffs' alleged differences in their lives before and after their accidents were

belied by the record. In *Lopez-Garcia*, the alleged post-accident changes in his life "is contradicted by the overwhelming evidence in the record." 207 F. Supp. 3d at 760 (citation omitted). In *Skipper v. United States*, "[the plaintiff's] argument that her ability to lead a normal life was affected by the accident is contradicted by the overwhelming evidence in the record [, which] detail[ed] [the] plaintiff's injuries and limitations long before the accident." No. 14-CV-14281, 2016 WL 827376, at *7 (E.D. Mich. Mar. 3, 2016). In *McCarthy v. Docherty,* the limitations described by the plaintiff were "present and repeatedly recorded in his pre-accident medical records." No. 348072, 2020 WL 1963986, at *2 (Mich. Ct. App. Apr. 23, 2020). And in *Cobb v. Parks*, the record showed that the plaintiff had recovered to his pre-accident baseline and his remaining restrictions were admittedly self-imposed. No. 342774, 2019 WL 3437007, at *12 (Mich. Ct. App. July 30, 2019).  Here, Defendants have offered no substantive evidence to contradict Plaintiff's testimony alleging material changes in his life.

Plaintiff has carried his burden to show the effects of his impairments on his general ability to live his normal life. Altogether, the court finds that Plaintiff has offered sufficient evidence to demonstrate a genuine dispute of facts as to the existence of a serious impairment of body function.

## B.  Causation

To sustain his negligence claim, Plaintiff must demonstrate a causal relationship between his injuries and the accident. *Haliw v. Sterling Heights,* 464 Mich. 297, 309-10 (2001) (listing the element of negligence). The Michigan Supreme Court has explained the causation requirement as follows:

> Proof of causation requires both cause in fact and legal, or proximate, cause. Cause in fact requires that the harmful result would not have come

about but for the defendant's negligent conduct. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences.

*Id.* (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 162-63 (1994)); *Ray v. Swager*, 501 Mich. 52, 63-64 (2017).

"Plaintiff must introduce evidence which provides a reasonable basis upon which a [finder of fact] could conclude that it was more likely than not that the defendant's conduct in fact caused the injury." *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 971 (6th Cir. 1994). "'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced,' the plaintiff has not met the burden." *Id.* (quoting *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 416 n.18 (1989)). Simply because an injury occurred after an event does not provide a sufficient basis to find causation. "[*P*]ost hoc, ergo propter hoc is not a rule of legal causation." *Abbott v. Fed. Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990); *Lowery v. Enbridge Energy Ltd. P'ship*, 500 Mich. 1034, 1034 (2017) ("But fact-finders, be they jury or court, may not indulge in conjecture. They are constrained to draw reasonable inferences from established facts. Reasoning 'post hoc ergo propter hoc' does not meet this test.") (quoting *Genesee Merchs. Bank & Trust Co. v. Payne*, 381 Mich. 234, 248 (1968) (opinion by Kelly, J.)). In this same vein, medical records of an injury alone are not enough; a plaintiff must offer a facially apparent connection to the underlying trauma, or an expert opinion establishing the same. *See Lopez-Garcia*, 207 F. Supp. 3d at 759. "Causation is an issue that is typically reserved for the trier of fact unless there is no dispute of material fact." *Patrick v. Turkelson*, 322 Mich. App. 595, 616 (2018) (citing *Holton v. A+ Ins. Assoc., Inc.*, 255 Mich. App. 318, 326 (2003)).

Defendants argue that Plaintiff cannot link his back, neck, shoulder and hip injuries with the January 7 rear-ender. Defendants point to the police video "confirm[ing] a lack of any injury," the post-accident x-rays demonstrating no acute fractures, dislocations or lesions, and their expert's analysis "confirm[ing] no injury was possible in the subject incident." (ECF No. 19, PageID.125.) In response, Plaintiff relies on Dr. Doig's opinion that Plaintiff's shoulder injuries likely resulted from the collision (ECF No. 20, PageID.321). Defendants then counter that Dr. Doig's causation conclusion is inadmissible because it does not comport with the requirement of expert testimony under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court agrees with Defendants.

"Generally, a treating physician may provide expert testimony regarding a patient's illness, the appropriate diagnosis for that illness, and the cause of the illness." *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 426 (6th Cir. 2009) (citing *Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 870 (6th Cir. 2007)). "However, a treating physician's testimony remains subject to the requirement set forth in *Daubert* . . . that an expert's opinion testimony must 'have a reliable basis in the knowledge and experience of his discipline.'" *Id.* (quoting *Daubert*, 509 U.S. at 592).

As the proponent of Dr. Doig's testimony, Plaintiff bears the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). Admission of expert testimony is governed by Federal Rules of Evidence 702 and 104(a). Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Several non-exclusive factors are considered in determining the reliability of an expert's proffered testimony:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether the technique has a high known or potential rate of error; and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community.

*Wilden v. Laury Transp., LLC*, 901 F.3d 644, 649 (6th Cir. 2018) (citing *Daubert*, 509 U.S. at 593-94; *Kumho Tire Co.*, 526 U.S. at 147-50). The court focuses on the principles and methodology used by the expert, not on the opinions and conclusions generated. *Daubert*, 509 U.S. at 594-95. An expert's opinion must be supported by more than subjective belief; it requires support by "good grounds" based on what is known. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800-01 (6th Cir. 2000). "However, mere 'weakness in the factual basis of an expert witness' opinion . . . bears on the weight of the evidence rather than on its admissibility.'" *Id.* (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)).

In dealing with treating physicians' opinion testimony, the court is particularly cognizant of the difference between "diagnosis (what disorder caused the set of

symptoms observed?)" and "etiology (what caused the disorder diagnosed?)."[29] *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 669 (6th Cir. 2010). The court does not "conflate[ ] a doctor's expertise in diagnosis with a doctor's expertise in etiology," as "most treating physicians have more training in and experience with diagnosis than etiology." *Id.* at 673. The court is also conscious of the disparity between clinical and legal approaches to etiology. *See id.* ("When physicians think about etiology in a clinical setting, . . . they may think about it in a different way from the way judges and juries think about it in a courtroom."). With those considerations in mind, the court "must apply the *Daubert* principles carefully" in treating Dr. Doig's opinion about the causation of Plaintiff's injuries. *Id.*

The court finds that Plaintiff has failed inhe s his burden to show that Dr. Doig's conclusion "is the product of reliable principles and methods." Fed. R. Evid. 702.[30] Dr. Doig admitted that he based his opinion – that Plaintiff's shoulder injuries were likely caused by the accident – solely on Plaintiff's description of his medical history and Plaintiff's telling him that his injuries started after the car accident. (ECF No. 27-7, PageID.515, 520-21.) However, because a condition appears *following* an event does

---

[29]     "To use an analogy, chronic shortness of breath may be caused by diseases ranging from emphysema to lung fibrosis to bronchitis to heart disease—which would be the diagnosis. Heart disease, to pick one of these diagnoses, may be caused by diet, smoking, genetics or some combination of the three—which would be the etiology." *Tamraz*, 620 F.3d at 669.

[30]     Plaintiff asserts that "Defendants have not provided this Court with any opposing evidence from an expert challenging Dr. Doig's methodology or suggesting that his principles are improper or unreliable." (ECF No. 27, PageID.486.) However, Defendants do not bear the burden to show Dr. Doig's testimony was inadmissible; rather, it is Plaintiff who must establish its admissibility. *See also Equal Emp't Opportunity Comm'n v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 753 (6th Cir. 2014) (rejecting "a fallacy" that it is opponent's or court's burden to show expert's testimony was inadmissible, rather than proponent's burden to show testimony was admissible).

not mean the condition was *caused* by the event. *Abbott*, 912 F.2d at 875; *Lowery*, 500 Mich. at 1034. At most, "[a] mere possibility" existed that the accident caused Plaintiff's injuries, but finding causation on this alone would be "pure speculation or conjecture." *Glaser,* 32 F.3d at 971.

Additionally, the Sixth Circuit has said that an expert's etiological conclusion is often inadmissible unless the court answers affirmatively to the following questions: "(1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes?" *Tamraz*, 620 F.3d at 674 (citing *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 179 (6th Cir. 2009)). Setting aside the accuracy of Dr. Doig's diagnosis, he acknowledged that several of Plaintiff's symptoms are consistent with a pre-existing degenerative condition. (*E.g.,* ECF No. 27-7, PageID.522-23). But nothing indicates that he contemplated this or any other alternative causes, or employed any method to rule them out in coming up with his opinion. Accordingly, the court cannot find that Dr. Doig's etiological conclusion – that the accident caused Plaintiff's injuries – is admissible scientific knowledge under Rule 702 and *Daubert*. *See Tamraz,* 620 F.3d at 671 (rejecting etiological conclusion that manganese exposure was the cause of parkinsonism, in part because "[the expert]'s efforts to rule in manganese exposure as a possible cause or to rule out other possible causes turned on speculation, not a valid methodology"); *Amerson v. Stechly*, No. 12-10375, 2015 WL 6436341, at *2 (E.D. Mich. Oct. 22, 2015) (striking the treater's etiological conclusion that the plaintiff's seizures were likely caused by trauma to the brain, specifically a kick to the head, as the treater based his conclusion solely on the accounts of the plaintiff and his mother and did not

consider alternative causes consistent with the plaintiff's symptoms or employ any method to determine that alternative causes were less likely).

It makes no difference that Dr. Doig purported to have made his opinion "within a reasonable degree of medical certainty." (ECF No. 20-8, PageID.351.) "Whatever [Dr. Doig] understood by 'with[in] a reasonable degree of medical certainty,' the phrase – the conclusion by itself – does not make a causation opinion admissible." *Tamraz,* 620 F.3d at 671. "The '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Because Dr. Doig's etiological conclusion is at most a working hypothesis, not admissible scientific knowledge, it does not satisfy Plaintiff's burden to show a genuine issue of causation for trial. *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible.") (quoting *Alpert v. United States,* 481 F.3d 404, 409 (6th Cir. 2007)). Without any evidence to provide a reasonable basis upon which a jury could conclude that it was more likely than not that the accident in fact caused Plaintiff injuries, as a matter of law, Plaintiff's negligence claim must be dismissed.

### IV. CONCLUSION

Even though there is a genuine issue over the existence of a serious impairment of body function, since the court has ruled that Dr. Doig's etiological opinion is not admissible, Plaintiff is unable to establish a material issue of fact on the causation element of his personal injury claim. Accordingly,

IT IS ORDERED that Defendants' motion for summary judgment (ECF No. 19) is GRANTED. A separate judgment will be issued.

IT IS FURTHER ORDERED that Defendants' outstanding motion (ECF No. 26) is DENIED AS MOOT.

                                    s/Robert H. Cleland       /
                                    ROBERT H. CLELAND
                                    UNITED STATES DISTRICT JUDGE

Dated: August 31, 2022


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 31, 2022, by electronic and/or ordinary mail.

                                    s/Lisa Wagner          /
                                    Case Manager and Deputy Clerk
                                    (810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\20-11739.FINLEY.MotionforSummaryJudgment.NTH.v2.docx